UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| TARA FOGLEMAN-LAXEY §<br>§<br>§<br>*Plaintiff,* §<br>§<br>§<br>v. §<br>§<br>JOSH GUILLORY, MAYOR-PRESIDENT §<br>OF THE CITY OF LAFAYETTE; §<br>LAFAYETTE CONSOLIDATED §<br>GOVERNMENT; SCOTT MORGAN, §<br>INTERIM POLICE CHIEF OF THE §<br>LAFAYETTE POLICE DEPARTMENT; §<br>MARK GARBER, SHERIFF OF §<br>LAFAYETTE PARISH; DONALD §<br>LANDRY, DISTRICT ATTORNEY FOR §<br>THE 15TH JUDICIAL DISTRICT OF §<br>LOUISIANA; and POLICE §<br>OFFICER  DOES 1 THROUGH 10, §<br>§<br>*Defendants.* §<br>§ | CIVIL ACTION NO.: <u>6:21-cv-03038</u><br><br>DISTRICT JUDGE: <u>TBD</u><br><br><br>MAGISTRATE JUDGE: <u>TBD</u><br><br><br><br><br><br><br><br>JURY TRIAL REQUESTED |

## **COMPLAINT**

1.      COMES NOW Plaintiff Tara Fogleman-Laxey ("Plaintiff" or "Ms. Fogleman-Laxey"), by and through her undersigned counsel, and for her Complaint against Defendants—Josh Guillory, Mayor-President of the City of Lafayette ("Mayor Guillory" or the "Mayor"); Lafayette Consolidated Government ("Consolidated Government"); Scott Morgan, former Interim Police Chief of the Lafayette Police Department ("Chief Morgan"); Mark Garber, Sheriff of Lafayette Parish ("Sheriff Garber"); Donald Landry, District Attorney for the 15th Judicial District of Louisiana ("DA Landry"); and Police Officer Does 1 through 10 ("Defendant Officers")—she hereby states and alleges as follows:

## INTRODUCTION

2.      This case is about Defendants' abuse of their powers to abridge Plaintiff Tara Fogleman-Laxey's constitutionally protected First Amendment rights to free speech and to peacefully assemble on a public road near Mayor Guillory's residence.  Defendants not only infringed on Ms. Fogleman-Laxey's constitutionally protected rights, but they also used excessive force to seize her without lawful authority to do so.  To be clear, violent and illegal conduct are not constitutionally protected and are not something Mr. Fogleman-Laxey or her counsel defend. Indeed, that is not what happened here.  Ms. Fogleman-Laxey is entitled to exercise her constitutional rights without being subjected to harassment, abuse, or violence by the very people who are supposed to protect her rights under the United States and Louisiana Constitutions and laws.  Ms. Fogleman-Laxey thus files this case to vindicate her rights and to ensure no other person is forced to suffer as she has.

3.      On August 29, 2021, Ms. Fogleman-Laxey set out from her house to exercise her First Amendment rights to peacefully protest on a public street near Mayor Guillory's residence with approximately two other nonviolent protestors.  Ms. Fogleman-Laxey's chosen method of protest was a community barbeque ("BBQ") to promote a discussion with the Mayor about the killing of Trayford Pellerin ("Mr. Pellerin"), a 31-year-old Black man, by the Lafayette Police Department ("Police").  Ms. Fogleman-Laxey's BBQ was joined by over 15,000 participants via a Facebook Live video stream ("Video").



*Ms. Fogleman-Laxey barbecuing during her peaceful protest.*

4.      Ms. Fogleman-Laxey chose to exercise her First Amendment right to speak about Mr. Pellerin's killing because of the injustice and lack of accountability surrounding his death. Mr. Pellerin died on August 21, 2020 at the hands of half a dozen Police officers who shot him 11 times as he entered a gas station convenience store.  None of the Police officers were indicted. The final moments and death of Mr. Pellerin, similar to far too many other killings of Black people by police, led to a community outcry for justice, which was largely ignored by the Mayor.

5.      Ms. Fogleman-Laxey's BBQ protest was one such outcry for justice.  Despite the *undisputed* peaceful nature of her BBQ protest, Mayor Guillory directed the Police to immediately shut it down.   As a result of Mayor Guillory's order and the Police's ratification and/or acquiescence of that order, Ms. Fogleman-Laxey's small peaceful BBQ protest abruptly ended when the Police arrived at the scene, sought her out, and arrested her on a bogus charge of obstructing a public roadway with her BBQ grill.  As illustrated by the picture below, Ms. Fogleman-Laxey's BBQ grill in no way obstructed the public road on which it sat as vehicles and persons easily moved about on said road:



*SUV driving by the BBQ protest grill while Ms. Fogleman-Laxey is interviewed by TV Station*

6.      Although there was no obstruction of a public roadway, Defendants weaponized their status, position, and authority in order to unconstitutionally apply a state law for the sole purpose of chilling Ms. Fogleman-Laxey's speech and abridging her rights to peacefully assemble. Defendants did so to prevent Ms. Fogleman-Laxey from speaking out in the face of racial injustice and police misconduct towards Black people and to prevent other would-be protesters from doing the same.  Not only did Defendants violate Ms. Fogleman-Laxey's First Amendment rights, but they also violated her Fourth Amendment rights by using excessive force to arrest her and by seizing her without lawful authority to do so.

7.      To be clear, Ms. Fogleman-Laxey did absolutely nothing wrong—indeed, as the judge assigned to her criminal case clearly stated in dismissing her case, DA Landry was wrong for improperly bringing his "politics into [the judge's] court."  Even though Ms. Fogleman-Laxey did nothing wrong, the Defendant Officers, at the direction of Mayor Guillory, Chief Morgan,

and/or Sheriff Garber, conducted a pat-down, confiscated her cell phone, and then arrested Ms. Fogleman-Laxey without either reasonable suspicion or probable cause.  In doing so, the Defendant Officers intentionally handcuffed her in a manner that caused unnecessary injury to Ms. Fogleman-Laxey, despite being told by Ms. Fogleman-Laxey that such injury would occur.

8.      Defendants chose to arrest Ms. Fogleman-Laxey in front of her fellow protestors, her child, and her grandchildren, who were arriving at the protest as Ms. Fogleman-Laxey was being arrested. Moreover, as Ms. Fogleman-Laxey broadcasted her peaceful protest on Facebook so that protestors and allies could participate virtually, thousands of people who participated in the protest witnessed how the Defendant Officers intimidated and unlawfully arrested her. Defendants' actions were intended to violate and chill Ms. Fogleman-Laxey's First Amendment protected rights, to shame and humiliate her, and to deter other peaceful protestors from engaging in the same protected activity.

9.      Ms. Fogleman-Laxey's painful ordeal did not end with her arrest.  After her arrest, Ms. Fogleman-Laxey was taken to a police station where she was handcuffed to a wall and subjected to a tirade by a Defendant Officer who compared Mr. Pellerin's life to that of a dog's. She was then taken to the Lafayette Parish Correctional Center ("Correction Center"), where she was placed in custody despite pre-existing conditions, like asthma and obesity, that placed her at higher risk of complications from COVID-19 and despite the Correction Center's COVID intake policy ("COVID Intake Policy"), which barred her custody unless she "commit[ed a] violent crime[] or [was] deemed to be an imminent threat to the public."  Ms. Fogleman-Laxey fit into neither category, but she was nevertheless taken into the Correction Center, subjected to an invasive and unnecessary strip search, and provided with inadequate clothing and personal protective equipment to ward off the threat of contracting COVID-19.

10.     Eventually, Ms. Fogleman-Laxey was released from her unlawful detention at the Correction Center. For over five months she heard nothing further regarding the unjustified misdemeanor charges. That all changed when Ms. Fogleman-Laxey decided to again exercise her First Amendment rights during an Acadiana Patriots public meeting on January 28, 2021.  At In that public meeting, Ms. Fogleman-Laxey publicly questioned the Mayor about his policies on COVID-19 regulations, including his refusal to enforce a mask mandate.  The Mayor responded with a visible *sneer*.

11.     The next day, on January 29, 2021, upon information and belief, DA Landry formally charged Ms. Fogleman-Laxey with obstructing a roadway and disturbing the peace on the insistence and/or order of the Mayor because of the BBQ protest and/or her public questioning of him at the Acadiana Patriots public meeting.  The presiding judge, at the conclusion of her criminal hearing on February 9, 2021, summarized this case perfectly when he reprimanded the DA for bringing a case against Ms. Fogleman-Laxey, admonishing the DA to never *"bring [his] politics into [the judge's] court."*

12.     Defendants' response to the August 29, 2020 BBQ protest and January 28, 2021 Acadiana Patriots public meeting and their conduct during Ms. Fogleman-Laxey's arrest and detention are precisely the types of oppressive conduct against which the First, Fourth, and Fourteenth Amendments and their Louisiana Constitution counterparts were intended to protect against.

13.     As a result of the Defendants' actions, Ms. Fogleman-Laxey has experienced severe anxiety, panic attacks, depression, and lasting physical injuries exacerbated by her arrest. Defendants' unconstitutional and unlawful acts have caused Ms. Fogleman-Laxey to stop protesting in Lafayette for fear of future unlawful acts by Defendants, including repeats of the

injurious physical restraint, invasive strip search, and hazardous seizure to a confined facility during the COVID-19 pandemic.  Ms. Fogleman-Laxey's inability to continue advocating for Black lives hits very close to home—her son is Black, and she believes that his life is at stake if there is no accountability for Black lives lost at the hands of law enforcement, like Mr. Pellerin. She deeply fears that her Black son could be the next Mr. Pellerin, but struggles with the conflicting anxiety and fear that Defendants will further retaliate if she continues to use her voice and to protest in the community.

14.     In this lawsuit, Ms. Fogleman-Laxey seeks to uphold, against uncivil, unwarranted, unjust, and unlawful attacks, her rights under First, Fourth, and Fourteenth Amendments to peaceful assembly, petition for redress of grievances, equal protection under the law, freedom of speech, and freedom from unwarranted seizures by the government.  Similarly, Ms. Fogleman-Laxey seeks to uphold the same rights under the Louisiana constitution and to vindicate said rights under Louisiana state law for the wrongs described above.

## **PARTIES**[1]

15.     Plaintiff Tara Fogleman-Laxey is a mother and local civil rights activist.  She is a resident of the Western District of Louisiana.

16.     Defendant Josh Guillory is the Mayor-President of the Lafayette Consolidated Government and a resident of the Western District of Louisiana.  Defendant Mayor Guillory is sued in his personal and official capacities.

17.     Defendant Lafayette Consolidated Government comprises the governments of the City of Lafayette, Louisiana and Parish of Lafayette, Louisiana and is located within the Western

---

[1]     As required under Federal Rule of Civil Procedure 5.1, the Louisiana Attorney General is being served with this Complaint "by certified or registered mail or by sending it to an electronic address designated by the attorney general for this purpose." The Louisiana Attorney General will also be served with the required notice of constitutional question that Plaintiff plans to file shortly after this Complaint is filed. *See* Fed. R. Civ. P. 5.1(a)(2).

District of Louisiana.  Moreover, the Consolidated Government also includes the Lafayette Police Department and Sheriff's Department.

18.     Defendant Scott Morgan was the former Interim Police Chief for the Lafayette Police Department at the time of Ms. Fogleman-Laxey's arrest and, upon information and belief, is a resident of the Western District of Louisiana.  Upon information and belief, Defendant Chief Morgan's responsibilities included, but were not limited to, the hiring, screening, training, retention, supervision, discipline, counseling, and control of the officers under his command who are or were employed by the Lafayette Police Department.  Defendant Chief Morgan is sued in his official capacity.

19.     Defendant Mark Garber is the Sheriff of Lafayette Parish and, upon information and belief, a resident of the Western District of Louisiana.  Upon information and belief, Sheriff Garber's responsibilities include, but are not limited to, the hiring, screening, training, retention, supervision, discipline, counseling, and control of the officers under his command who are or were employed by the Lafayette Parish Sheriff's Office.  Sheriff Garber is sued in his official capacity.

20.     Defendant Donald Landry is the District Attorney for the 15th Judicial District of Louisiana and, upon information and belief is a resident of the Western District of Louisiana. Defendant Landry is sued in his official and personal capacities.

21.     Defendant Officers John and Jane Does 1 through 10 (collectively, "Defendant Officers") are law enforcement officers employed by the City of Lafayette Police Department and/or Lafayette Parish Sheriff's Department that were present at the scene of Ms. Fogleman-Laxey's arrest, the police station, and/or the jail.  These officers are persons for purposes of 42 U.S.C. § 1983. These officers are sued in their individual capacities.  At all relevant times, these officers were acting under color of the law of the State of Louisiana.

22.     Defendants are jointly, severally, and individually liable for the intentional, excessive, and otherwise unconstitutional and tortious conduct set forth below.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a) because the asserted causes of action are issues of federal law, derived from claims under 42 U.S.C. § 1983, and the First, Fourth, and Fourteenth Amendments of the United States Constitution.

24.     This Court, under 28 U.S.C. § 1367, has supplemental jurisdiction over claims that arise under the laws of the State of Louisiana because they are derived from the same common nucleus of operative fact as the federal claims.

25.     This Court has personal jurisdiction over the defendants and venue is proper in the Western District of Louisiana under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in this district and all defendants reside in the forum state while at least one defendant resides in this district.

26.     Declaratory relief is authorized by 28 U.S.C. § 2201. A declaration of law is necessary to determine the rights and duties of the parties.

## FACTUAL ALLEGATIONS

A.  THE POLICE KILLING OF MR. PELLERIN ON AUGUST 21, 2020 PROVOKED A COMMUNITY RESPONSE.

27.     On the evening of August 21, 2020, the Lafayette community was shocked by the death of Mr. Pellerin.  Mr. Pellerin died at the hands of several Police officers, who fatally shot him 11 times in the back at point-blank range as he entered a gas station convenience store.  The final moments and death of Mr. Pellerin, similar to far too many other killings of Black people by police, led to a community outcry for justice.



*Police body camera footage of officers shooting Mr. Pellerin*

28.     From the day after Mr. Pellerin's death, hundreds of Louisianans took to the streets in Lafayette to protest Mr. Pellerin's death and to demand accountability for discriminatory policing practices.[2] These protests were unarmed, nonviolent, and took place throughout Lafayette. Unfortunately, those pleas for justice were met with further police violence.  For example, to disperse peaceful demonstrators that gathered for a vigil at the place where Mr. Pellerin was killed, law enforcement agents wore riot gear while confronting protestors.[3]  Protestors then began gathering on Moss Street in Lafayette near a police precinct to continue demonstrating.  That peaceful protest came to an abrupt end when law enforcement blasted smoke and flash bang explosives, forcing protestors to run.[4]  Three protestors—Kimberly Culotta, Samuel Johnson, and

---

[2]     Ashley White, *Trayford Pellerin shooting: What we know about his death and the aftermath*, THE ADVERTISER (Sept. 1, 2020), *available at* https://www.theadvertiser.com/story/news/2020/09/01/lafayette-police-shooting-what-we-know-trayford-pellerin-death/3456028001/. *Id.*

[3]     *Id.*

[4]     Ashely White and Alyssa Berry, *Peaceful vigil for Lafayette police shooting victim becomes clash between marchers, police*, THE ADVERTISER (Aug. 22, 2020), *available at* https://eu.theadvertiser.com/story/news/2020/08/22/speakers-urge-justice-vigil-black-man-killed-lafayette-police-black-lives-matter-trayford-pellerin/3420860001/

Jyhikeen Simien—were arrested and charged with obstructing public passages.[5]  All three were booked despite changes to the Correctional Center's Intake Policy, which, as explained further below, explicitly limited those who could be jailed.[6]



*Police Officers Confronting Protestors at the Gas Station Where Mr. Pellerin Was Killed*

29.     On the second day of protests over Mr. Pellerin's death, law enforcement in riot gear again confronted peaceful protestors gathering on Camellia Boulevard in Lafayette. Approximately twenty minutes after arriving at the protest, law enforcement began attacking peaceful protestors with pepper bullets that released a chemical dispersant in the crowd.[7] Subsequently, upon information and belief, at a similar peaceful gathering near Acadiana Mall in Lafayette, law enforcement officers struck, unprovoked, approximately four peaceful demonstrators directly in the head with a baton, causing severe injuries.

30.     Mayor Guillory, who defended the killing of Mr. Pellerin,[8] thereafter responded by

---

[5]     Ashely White, *Protesters arrested during Saturday clash with officers facings charges for blocking roads,* Lafayette      Daily      Advertiser      (Aug.      23.      2020),      *available at* https://www.theadvertiser.com/story/news/local/2020/08/23/three-arrested-lafayette-police-shooting-protest-trayford-pellerin/3423898001/
[6]     *Id*.
[7]     Advocate Staff, *Chemical dispersants used against protestors of fatal Lafayette police shooting*, THE ADVOCATE (Aug. 23, 2020), *available at* https://www.theadvocate.com/acadiana/news/crime_police/article_c8a9ffa4-e59e-11ea-8513-27010c0c4e08.html
[8]     *Id*.

criminalizing peaceful protests over his death, further "contributing to tensions felt in [Lafayette]."[9]  Indeed, shortly after the protests began, Mayor Guillory extended an executive order that effectively banned protests in the downtown area and parts of the University of Louisiana at Lafayette, specifically targeting areas where there were past protests of racial injustice and police misconduct.[10]  The executive order, which was extended on August 28, 2020, banned "congregating or loitering," threatening penalties of up to $500 or six months in jail.[11]

  31. The timing of the executive order in relation to the protests over Mr. Pellerin's death was not coincidental.  Although Mayor Guillory attempted to guise this order as part of his "social distancing procedures" during the on-going COVID-19 pandemic,[12] the prohibition's target of specific locations and Mayor Guillory's general statements about COVID-19 regulations make clear that this rationale for the order was simply pretextual.  For example, Mayor Guillory has openly mocked restrictions relating to COVID-19.  In July 2020, during a peak in COVID-19 cases in Lafayette, he outright refused to consider a local mask ordinance.[13]  During a public debate explaining his decision to reject such an ordinance, he claimed that individuals who followed mask mandates are "sheeples," implying that these types of regulations were ineffective against COVID-19.  These statements, in combination with his inflammatory comments that protest leaders were "terrorists"[14] during a television interview, lay bare his true motivation and policy behind this

---

[9] *Id.*
[10] KATC News, ACLU Demands Guillory Retract Unconstitutional Protest Ban, KATC (Aug. 31, 2020), https://www.katc.com/news/lafayette-parish/aclu-demands-guillory-retract-unconstitutional-protest-ban; *see also* Christiaan Mader, *Guillory's hole grows deeper with fallout over Hurricane Laura shelters, The Current (Aug. 31, 2020),* https://thecurrentla.com/2020/guillorys-hole-gets-deeper-with-fallout-over-shelters/.
[11] *Id.*
[12] Victoria Dodge and Ashley White, *Trayford Pellerin shooting: Protesters call for more information, transparency in case,* THE LAFAYETTE DAILY ADVERTISER (Sept. 4, 2020), *available at* https://www.theadvertiser.com/story/news/local/2020/08/29/lafayette-police-shooting-trayford-pellerin/5670377002/
[13] *Id.*
[14] Andrew Capps, *Once a refuge after hurricanes, Lafayette suspends shelter plans over protest's "bad actors,"* THE LAFAYETTE DAILY ADVERTISER (Aug. 31, 2020), *available at* https://www.theadvertiser.com/story/news/local/2020/08/31/lafayette-police-shooting-parish-halts-laura-shelter-plans-over-protests-trayford-pellerin/5678653002/.

executive order: the quelling of the right to demand justice for Mr. Pellerin's killing and to criminalize peaceful demonstrators in Lafayette.

**B.   DEFENDANTS ARRESTED MS. FOGLEMAN-LAXEY FOR PEACEFULLY BARBEQUING ON A PUBLIC STREET.**

32.     In the days after Mr. Pellerin's death, Mayor Guillory refused to visit the "Northside" communities in Lafayette that were protesting the shooting, nor would he personally speak to Mr. Pellerin's family about his death.  As a result, Ms. Fogleman-Laxey felt compelled to get the attention of Mayor Guillory in order to peacefully discuss Mr. Pellerin's death at the hands of the police.[15]  But, because Mayor Guillory refused to visit the Northside or to engage with protestors, Ms. Fogleman-Laxey announced on her Facebook platform that she would peacefully protest in Mayor Guillory's neighborhood.[16]

33.     To this end, on August 29, 2020, Ms. Fogleman-Laxey decided to host a peaceful BBQ on the public road near the Mayor's home in the hopes of engaging the Mayor in a peaceful dialogue with the Mayor about Mr. Pellerin's killing and the outrage in the Lafayette community about police violence and conduct.  Ms. Fogleman-Laxey had no intention of violating—and indeed did not violate—any laws; she went as far as consulting two local attorneys to ensure that she stayed within the bounds of the law during her BBQ protest.  Both attorneys assured Ms. Fogleman-Laxey that her plan to conduct a peaceful BBQ on the wide public road near the Mayor's house was legal.

34.     After speaking to the attorneys, Ms. Fogleman-Laxey published a post on her Facebook profile inviting the public to join her BBQ on the public road near the Mayor's house.

---

[15]    KATC News, *Protester who held cookout in front of mayor's home speaks*, KATC (Aug. 30, 2020), *available at* https://www.katc.com/news/lafayette-parish/protester-who-held-cookout-in-front-of-mayors-home

[16]    KATC News, *Small Protest at Lafayette Mayor-President's Home,* KATC (Aug. 29, 2020), *available at* https://www.katc.com/news/lafayette-parish/small-protest-at-lafayette-mayor-presidents-home.

Shortly after posting her invitation on Facebook, Ms. Fogleman-Laxey received a call from Carlos Harvin, the Chief of Minority Affairs for the Lafayette Consolidated Government.  Ms. Fogleman-Laxey explained the purpose of her BBQ to Mr. Harvin and expressed her desire to speak with the Mayor.  Mr. Harvin told Ms. Fogleman-Laxey that he would try to get the Mayor to speak with her and offered to mediate that meeting and conversation.

35.     Ms. Fogleman-Laxey drove to the Mayor's publicly accessible neighborhood and legally parked her truck on the side of the public road, clear from traffic.  Ms. Fogleman-Laxey then set up a BBQ grill on the public road behind the bed of her truck.  Neither Ms. Fogleman-Laxey's truck nor the BBQ grill were directly in front of the Mayor's house.

36.     After she parked on the side of the public road, Ms. Fogleman-Laxey began a Video of the BBQ protest.  As Ms. Fogleman-Laxey made clear in the Video, she was not there to "cause trouble," as the purpose of her BBQ was to serve the community and create an opportunity for the Mayor to address Lafayette residents.  Her video grabbed the attention of 15,000 viewers who were participating in the protest virtually.

37.     Even with Ms. Fogleman-Laxey's truck parked at the curb, the public road was wide enough to allow cars to drive in both directions without obstruction or interference and for persons to traverse the sidewalk, public road, and surrounding areas with ease.  In fact, Ms. Fogleman-Laxey's BBQ grill, which was placed directly behind her truck and was narrower in width than the truck, never obstructed or prevented a single car, of which there were a few, from freely using the public road, or a person, including Defendant Officers, from freely using the road, sidewalk, or surrounding area.  As illustrated by the image below, at no point did Ms. Fogleman-Laxey's BBQ grill, truck, or presence hamper or impede the public's use of the road:



*The BBQ protest, unobstructed public road and sidewalk, and arrest of Ms. Fogleman-Laxey[17]*

38.     During the BBQ protest, Ms. Fogleman-Laxey noticed a person inside the Mayor's home watching her through the window.  Upon information and belief, the Mayor's security team also watched Ms. Fogleman-Laxey from a parked car near the protest.

39.     A Channel 3 television crew arrived at Ms. Fogleman-Laxey's BBQ protest to interview her.  Ms. Fogleman-Laxey told the television crew that her protest was peaceful, legal, and well-meaning, stating that "it is important that we handle things in peace," that "we come in peace," and that "we are not here to be radical or noisy."[18]  Ms. Fogleman-Laxey invited the Mayor to join her for "a hamburger or hotdog" and to discuss the issues affecting the Lafayette community.

40.     Gerry Monroe, a nationally known activist, was also present at Ms. Fogleman-Laxey's peaceful BBQ protest and was also interviewed by Channel 3.[19]  Mr. Monroe echoed Ms. Fogleman-Laxey's desire for a peaceful conversation and to continue the peaceful protest until the

---

[17]   *Id.*
[18]   *Id*
[19]   *Id.*

Mayor agreed to engage in a public conversation over Mr. Pellerin's killing at the hands of Lafayette police officers.

41.     A short while after the BBQ protest began, Mr. Harvin arrived at the peaceful BBQ protest.  Mr. Harvin explained that his purpose was to mediate a dialogue between the Mayor and the three protestors: Ms. Fogleman-Laxey, Mr. Gerry Monroe, and Mr. Robbie Schooley. More importantly, Mr. Harvin stated that what Ms. Fogleman-Laxey was doing was "legal."

42.     Upon information and belief, Mr. Harvin received a call from Mayor Guillory while he was speaking with Ms. Fogleman-Laxey.  Mr. Harvin ended the call by stating, "Yes, Mr. Mayor."   Then, without comment or explanation, Mr. Harvin abruptly abandoned his conversation with Ms. Fogleman-Laxey and quickly left the BBQ.  Upon information and belief, the Mayor instructed Mr. Harvin to leave the BBQ protest because he had ordered the Police, including Chief Morgan and/or Defendant Officers, to arrest Ms. Fogleman-Laxey for holding the BBQ protest, which had been attended by thousands online, near his house.

43.     Minutes after the Mayor called Mr. Harvin, Defendant Officers arrived at the BBQ protest.  One Defendant Officer, an unidentified female police lieutenant, approached the BBQ grill and asked for Ms. Fogleman-Laxey by name.  This Defendant Officer told Ms. Fogleman-Laxey that she was obstructing a public roadway but failed to explain or identify how that was so. Indeed, the Defendant Officer made this statement despite having free, unobstructed access to the public road, sidewalk, and other areas near the BBQ grill as clearly captured by the image below:



*Defendant Officers at the BBQ Protest with unobstructed use of the road by cars passing by*

44.     Ms. Fogleman-Laxey explained to the Defendant Officer that she was not breaking any laws, which the Defendant Officer conceded as much to her.  Ms. Fogleman-Laxey offered to move the BBQ grill from behind her truck to several other locations, but the Defendant Officer refused to allow her to move it.  Instead, they told Ms. Fogleman-Laxey that it was in her "best interest" to stop the BBQ protest.

45.     Immediately thereafter, the Defendant Officer, without any provocation or reason, informed Ms. Fogleman-Laxey that she was under arrest. The Defendant Officer confiscated her phone and handcuffed her behind her back. She was the only person arrested even though two other people were participating in the peaceful BBQ protest at the time.  Originally, the Defendant Officers arrested Ms. Fogleman-Laxey solely for obstruction of a public passageway under Louisiana Revised Statute ("La. Rev. Stat.") § 14:100.1.  Later, while she sat handcuffed to a wall at the Police station, an additional charge of disturbing the peace under La. Rev. Stat. § 14:103 was added.  Both charges are misdemeanor violations.  Upon information and belief, Defendant Officers unlawfully targeted and arrested Ms. Fogleman-Laxey at the direction of Mayor Guillory

because he wanted to shut down her BBQ protest, which had assembled thousands online, in violation of the First Amendment.

46.     As with the obstruction of a public passageway charge, the post-arrest charge for disturbing the peace also has no basis in facts. At no point during the arrest was disturbing the peace a justification given for the arrest and no Defendant Officer stated that the BBQ protest or Ms. Fogleman-Laxey were in any way disturbing the peace.  To the contrary, as Ms. Fogleman-Laxey and Mr. Monroe made clear on several occasions on the Video and to the TV crew that interviewed them, the BBQ protest was a peaceful protest focused entirely on peacefully protesting racial injustice and lack of police accountability.  All the recorded video evidence is crystal clear—the peaceful BBQ protest did not to disturb the peace.  And neither did Ms. Fogleman-Laxey.

47.     The true irony of the unlawful use of the disturbing the peace statute against Ms. Fogleman-Laxey is that the Defendants are the only parties to have actually violated that statute, which defines disturbing the peace as the "[i]nterruption of any lawful assembly of people." La. Rev. Stat. § 14:103(A)(6).  Interrupting a peaceful, lawful assembly of people is exactly what Defendants did when they arrested Ms. Fogleman-Laxey.

C.  **DEFENDANTS' PRESS CONFERENCE EXPLAINED THAT THE MAYOR ORDERED THE ARREST OF MS. FOGLEMAN-LAXEY BECAUSE HE DID NOT LIKE THE FACT THAT HER BBQ PROTEST TOOK PLACE IN HIS "PEACEFUL NEIGHBORHOOD."**

48.     Shortly after Ms. Fogleman-Laxey's arrest, Mayor Guillory, Chief Morgan, Sheriff Garber, and the fire chief held a press conference to discuss, among other things, Ms. Fogleman-Laxey's arrest.[20]   During the press conference, a visibly agitated Mayor Guillory emphatically praised the First Amendment and then quickly undermined it by stating that he would not allow "civil unrest" like Ms. Fogleman-Laxey's peaceful BBQ protest, which had assembled

---

[20]   KATC News, *Guillory on protests: "Lafayette is under control,"* KATC (Aug. 29, 2020), *available at* https://www.katc.com/news/lafayette-parish/lafayette-mayor-president-police-department-holding-press-conference

thousands online, in his community.[21]

49.     According to the Mayor, Ms. Fogleman-Laxey's BBQ was "not [a] protest"; instead, he wrongfully claimed, it was "public intimidation" because his wife and children had to witness Ms. Fogleman-Laxey BBQ on the public road near his home.[22]  In response to a question about whether any property had been destroyed or invaded, the Mayor answered that "thanks to the very, very quick response from the Lafayette Police Department, no property was damaged," describing the decision to hold the protest as "very unfortunate."  For his wife and kids to witness this peaceful BBQ was, in the Mayor's eyes, a "tragedy."  A "tragedy" he would not tolerate.[23]  Thus, believing the BBQ was "escalating," and not wanting to see Ms. Fogleman-Laxey's BBQ protest in his "peaceful neighborhood," the Mayor called the Police.[24]  When asked to elaborate on what he meant by "escalating," he simply repeated his earlier comment and *smirked*.[25]

50.     Chief Morgan also spoke about Ms. Fogleman-Laxey's BBQ, confirming that she was arrested for two misdemeanor violations.[26]  In explaining why she was arrested, he indicated that Ms. Fogleman-Laxey was not arrested because her BBQ grill obstructed a passage way.[27]  The reason, according to Chief Morgan, was that a roadway is not a place for a BBQ pit and hanging out on tailgates:

> She is being charged with disturbing the peace and obstruction of a public passageway. The roadway is not a place for BBQ pits and hanging out on tailgates and things like that. When they violate those types of things, you wanna put em on the sidewalk, you can't come hang out in front of people's houses and do those types of things."[28]

---

[21]  *Id.*
[22]  *Id.*
[23]  *Id.*
[24]  *Id.*
[25]  *Id.*
[26]  *Id.*
[27]  *Id.*
[28]  *Id.*

51.     Despite Mayor Guillory's and Chief Morgan's suggestions that Ms. Fogleman-Laxey's BBQ protest was meant to intimidate the Mayor's wife and children, there is simply no evidence of that. Quite the contrary: Ms. Fogleman-Laxey did not know the Mayor's wife and children were in the house prior to the BBQ protest and video evidence clearly demonstrates that she never sought to target them in any way.  Moreover, Ms. Fogleman-Laxey made it absolutely clear that her BBQ protest was meant to open a dialogue with the Mayor about Mr. Pellerin's killing—a dialogue the Mayor made clear he would not engage in during the press conference.[29]

52.     Sheriff Garber also praised the First Amendment, acknowledging that he is responsible for ensuring that First Amendment rights are protected and claiming he would expend every resource and his own personal safety to protect the First Amendment right to peacefully protest.[30]  He also noted that  some protesters across Lafayette were protesting with firearms, and he went out of his way to claim that such persons have no history of violent action against the local community.[31]  Upon information and belief, no such protestors were arrested and/or detained for causing "civil unrest" or publicly "intimidat[ing]" the community despite openly carrying firearms—a more menacing and lethal item than a BBQ grill—in public areas. On the other hand, Sheriff Garber explicitly supported Mayor Guillory's and the Police's actions in dealing with other protesters, including Ms. Fogleman-Laxey.[32]

## D.  AFTER DEFENDANTS ARRESTED MS. FOGLEMAN-LAXEY, THEY USED EXCESSIVE FORCE, INVASIVELY STRIP SEARCHED HER, AND UNLAWFULLY DETAINED HER.

53.     Despite the peaceful nature of the BBQ protest and the absence of any reasonable suspicion, probable cause, or exigent circumstances that justified a search or seizure, one

---

[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*

Defendant Officer removed all of Ms. Fogleman-Laxey's personal property from her person, seized her cell phone, and conducted a pat-down search during her arrest.  After the pat-down, the Defendant Officer handcuffed Ms. Fogleman-Laxey, painfully tightening the handcuffs behind her back. The tight handcuffs exacerbated Ms. Fogleman-Laxey's pre-existing shoulder injuries, causing her to cry out, "You're hurting me!"  The Defendant Officer ignored her cries and refused to accommodate her by loosening the handcuffs or handcuffing her in an alternative, less painful manner, such as handcuffing her in the front of her body.  The placement of the handcuffs caused Ms. Fogleman-Laxey so much harm that she had severe bruising on her wrists that lasted for several weeks and her pre-existing shoulder injuries are exacerbated to this day since the arrest.[33]

54.     Ms. Fogleman-Laxey was humiliated by her public arrest.  Not only did over 15,000 viewers witness it on Video, but it also occurred in the presence of her friend, six children (three daughters and three sons), and eight young grandchildren who were arriving to participate in the BBQ protest at the time of Ms. Fogleman-Laxey's arrest.

55.     One Defendant Officer placed Ms. Fogleman-Laxey in a Police car and took her to the Police station.  At the station, the Defendant Officer inhumanely handcuffed Ms. Fogleman-Laxey to a wall.  A separate Defendant Officer then subjugated Ms. Fogleman-Laxey to an angry tirade comparing Mr. Pellerin's life to that of a dog's.  This uncalled-for verbal abuse describing a Black man, who reminded her of her own Black son, traumatized Ms. Fogleman-Laxey even further.

56.     After several hours without information or comprehension of her alleged "crimes," Ms. Fogleman-Laxey was moved to the Lafayette Parish Correctional Center

---

[33]   Handcuff injuries are known to be extremely painful and have been proven to cause permanent injuries. *See* F.S. Haddad, *Complaints of Pain After Use of Handcuffs Should Not Be Dismissed*, BMJ (Jan. 2, 1999), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1114546/.

("Correction Center"), a jail operated by the Lafayette Parish Sheriff's Office ("Sherriff").

57.    When undergoing the booking process at the Correction Center, Ms. Fogleman-Laxey told the Defendant Officers that she was suffering from certain pre-existing conditions that made her uniquely susceptible to COVID-19, such as asthma and obesity.[34]   Despite Ms. Fogleman-Laxey's comments, she received no suitable COVID-19 protections or accommodations while she was jailed in filthy conditions at the Correction Center.

58.    Even though the arresting Defendant Officer had already conducted a thorough pat-down before arresting Ms. Fogleman-Laxey, confiscating all of her belongings before placing her in the Police car, a different Defendant Officer performed an additional, unnecessary, and intrusive physical inspection of her person.  With no explanation, the Defendant Officer forced Ms. Fogleman-Laxey into an unknown location in the facility, and then ordered her to strip naked, bend over, and cough three times directly in front of her.

59.    On top of that, upon information and belief, to further harass, intimidate, and/or abuse Ms. Fogleman-Laxey, the Defendant Officers knowingly forced her to wear a prison uniform that was visibly too small for her.  She was forced to wear a tight prison jumpsuit with no underwear, as the prison-issued underwear was several sizes too small and visibly did not fit her.  Next, the Defendant Officers forced Ms. Fogleman-Laxey to wear a *dirty and used mask* as a supposed shield against COVID-19.  These events caused Ms. Fogleman-Laxey to fear exposure to COVID-19, a more likely occurrence in the Correction Center than in her community, without the proper protective equipment. For reference, one study found that prisoners are 5.5 times more

---

[34]    In August 2020, Louisiana had on average 613 new COVID-19 cases per seven-day averages. *See Tracking Coronavirus in Louisiana: Latest Map and Case Count*, N.Y. Times (Aug. 20, 2021) *available at* https://www.nytimes.com/interactive/2021/us/louisiana-covid-cases.html.

likely to get COVID-19 and 3 times more likely to die from it then the general population.[35]

Nevertheless, Mr. Fogleman-Laxey was forced to endure this inhumane treatment until she was

released several hours after her arrest.

### E. DEFENDANTS ARRESTED MS. FOGLEMAN-LAXEY DESPITE THE KNOWN DANGERS THAT COVID-19 POSES TO HIGHLY SUSCEPTIBLE PERSONS WHO ARE INCARCERATED, AND DID SO IN CLEAR VIOLATION OF THEIR OWN POLICIES.

58.     At the start of the COVID-19 pandemic, the Sheriff instituted changes in the

Correction Center's intake policy ("COVID Intake Policy").  Under these changes, the facility

"only accept[ed] suspects who commit *violent crimes* or those who are deemed to be an *imminent*

*threat* to the public."[36]  According to a spokesman for the Sheriff, such changes were made "to

help control the jail population for the safety and health of the inmates and the people that are

working in there."[37]

59.     At the time, Lafayette's Chief District Court Judge Marilyn Castle had empowered

law enforcement agencies to issue warrants instead of detaining suspects when there was no

imminent threat to public safety.[38]  One local newspaper, the Daily Advertiser, noted, "In most

cases where a violent crime isn't committed, offenders are being issued misdemeanor summons.

If a more serious crime is committed, but there is no threat to the public at the time, a warrant is

issued for that person to be arrested when jail restrictions are lifted."[39]

60.     Upon information and belief, even with the institution of the COVID Intake Policy,

Chief Morgan, Sheriff Garber, and the Defendant Officers knew that incarcerated individuals were

---

[35]    Saloner B, Parish K, Ward JA, DiLaura G, Dolovich S., *COVID-19 Cases and Deaths in Federal and State Prisons*, JAMA (July 8, 2020).
[36]    Ashley White, *COVID-19 changes at jail illustrate balance of public safety, inmate safety*, the Advertiser (Aug. 13, 2020)   https://www.theadvertiser.com/story/news/2020/08/13/lafayette-parish-covid-19-changes-jail-decrease-population/3358443001/ (emphasis added).
[37]    *Id.*
[38]    *Id.*
[39]    *Id.*

contracting COVID-19 at the Correction Center.[40]  Yet, despite this fact and knowing the unique health risks to Ms. Fogleman-Laxey were she to contract COVID-19 due to her pre-existing medical conditions, Chief Morgan, Sheriff Garber, and Defendant Officers arrested Ms. Fogleman-Laxey and/or processed her into the Correction Center for nonviolent misdemeanor offenses.  For reference, over a one-week period in July 2020, 102 people were arrested in Lafayette but only 17 were booked into jail.[41]  The arresting officers generally issued misdemeanor summons instead of taking the individuals to jail.[42]  Examples of cases *not booked* include: an "irate" man causing a disturbance at a Discovery Inn who took an "aggressive stance against [Police] officers"; a person who had previously been convicted of a felony, who was charged with possession of a firearm; a man with a warrant for aggravated assault of a dating partner; and two drug possession arrests.[43]

61.     According to the COVID Intake Policy, Judge Castle's order, and the Correction Center's own booking patterns, Chief Morgan, Sheriff Garber, and Defendant Officers had no justifiable reason or authority to issue more than a misdemeanor summons for any alleged misdemeanor, but Mayor Guillory had other plans for Ms. Fogleman-Laxey.  Upon information and belief, the Mayor instructed Chief Morgan, Sheriff Garber, and Defendant Officers to violate the COVID Intake Policy, Judge Castle's order, and the Correction Center's own booking patterns, so that Ms. Fogleman-Laxey could be humiliated, intimidated, and/or harassed while she was detained for the purpose of suppressing and chilling her First Amendment freedom of speech and assembly rights, as well as those of the thousands who virtually joined the protest online.

---

[40]   *Id.*
[41]   *Id.*
[42]   *Id.*
[43]   *Id.*

**F.  Defendants prosecuted Ms. Fogleman-Laxey because she attempted to exercise her constitutionally protected rights.**

62.     For almost five months, Ms. Fogleman-Laxey heard nothing further about her arrest on August 29, 2020.

63.     On January 28, 2021, the Acadiana Patriots group hosted a public meeting.  Both Ms. Fogleman-Laxey and the Mayor were in attendance at this meeting.

64.     Ms. Fogleman-Laxey's objective in attending the meeting was to discuss the issues that the community was facing—primarily COVID-19.  At the meeting, Mayor Guillory explained his decision to refuse to enforce a local mask mandate; Ms. Fogleman-Laxey publicly questioned the Mayor's policy stance on COVID-19 regulations.  In response, the Mayor visibly *sneered* at her, seemingly acknowledging that he recognized her from the August 29th BBQ protest.

65.     The very next day, on January 29, 2021, DA Landry filed formal charges against Ms. Fogleman-Laxey based on the two misdemeanor violations arising from her August 29th BBQ protest.  Upon information and belief, DA Landry formally charged Ms. Fogleman-Laxey on the insistence and/or order of the Mayor because of the BBQ protest, which had assembled thousands online, and/or her public questioning of him at the public meeting.  The aim of these charges was to scare, harass, shame, and intimidate Ms. Fogleman-Laxey into silence and to prevent her and others from exercising their constitutional rights.

66.     Ms. Fogleman-Laxey's court hearing was scheduled for February 9, 2021. At the hearing, the charges against Ms. Fogleman-Laxey were dropped.  Importantly, at the conclusion of the hearing, the presiding judge summarized this case perfectly when he reprimanded DA Landry for bringing a case against Ms. Fogleman-Laxey, admonishing DA Landry to *never again "bring [his] politics into my court."*

## CAUSES OF ACTION

### COUNT 1:
### VIOLATIONS OF THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983 (AGAINST ALL DEFENDANTS)

67.     Ms. Fogleman-Laxey repeats and re-alleges the preceding allegations and incorporates them here by reference as if fully set forth herein.

68.     The First Amendment prohibits "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances," as applied to the states under the Fourteenth Amendment to the United States Constitution.  The violations of Ms. Fogleman-Laxey's First Amendment rights are actionable as constitutional violations and under 42 U.S.C. § 1983, which provides a federal cause of action and remedy when officers violate federal rights under the color of state or local authority.

69.     Title 14, §§ 14:100.1 and 14:103 of the La. Rev. Stat. are facially unconstitutionally vague and/or overbroad.

70.     A statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). As to the latter, a statute is vague when it fails to "'establish minimal guidelines to govern law enforcement'" thus allowing "'policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 573, 575 (1974)). For these reasons, courts apply a strict standard to determine whether a statute in "the area of free expression" contains "permissible statutory vagueness." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415 (1963).

71.     A statute is unconstitutionally overbroad if "a substantial number of its applications

are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, 1587, 176 L. Ed. 2d 435 (2010).

72.     Section 14:100.1 criminalizes obstruction of public passages.  La. Rev. Stat. § 14:100.1 states the following:

> No person shall willfully obstruct the free, convenient and normal use of any public sidewalk, street, highway, bridge, alley, road, or other passageway, or the entrance, corridor or passage of any public building, structure, water craft or ferry, by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein.

73.     Section 14:100.1 is overbroad because it applies to a "substantial" number of First Amendment protected activity, including but not limited to having a BBQ protest, walking on the street while discussing racial justice, standing on the sidewalk holding a sign asking for accountability for police officers.

74.     Section 14:103(A)(5) is vague and overbroad in that it criminalizes "disturbing the peace," which is defined, among other things, as the "[h]olding of an unlawful assembly," in a manner that "foreseeably disturb[s] or alarm[s] the public." La. Rev. Stat. § 14:103(A)(5).

75.     Section 14:103(A)(5) is vague because it fails to provide a person of reasonable intelligence what is prohibited or allowed and it fails to provide minimal guidelines to government law enforcement in its application.  Moreover, the statute, including terms such as "unlawful," is vague and ambiguous because it "so standardless" and lacking in "minimal guidelines to govern law enforcement" that it allows, welcomes, and encourages police officers and other government officials to use it in a way that infringes on First Amendment protected rights, such as speaking freely and peacefully assembling, they do not like or agree with. In fact, that is precisely what happened here—Defendants used this vague statute to prevent Ms. Fogleman-Laxey from exercising her rights.

76.     Section 14:103(A)(5) is overbroad because it applies to a "substantial" number of First Amendment protected activity, including but not limited to having a BBQ protest, walking on the street while discussing racial justice, or having a conversation on any number of topics in at the entry of a park.

77.     Alternatively: as applied, Defendants exploited Title 14, §§ 14:100.1 and 14:103 of the La. Rev. Stat. to criminalize and infringe upon Ms. Fogleman-Laxey's protected First Amendment rights.

78.     Ms. Fogleman-Laxey's BBQ protest on a public street, including making it available to thousands online via the Video, was a constitutionally protected exercise of her rights to speak freely, peacefully assembly, and petition the government.  Defendants' unlawful arrest of Ms. Fogleman-Laxey deliberately violated the well-established exercise of such rights in public forums such as public streets, roads, and spaces. *See Hague v. Committee for Industrial Organization*, 307 U.S. 496 (1939) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.  Such use of the streets and public places has, from ancient times, been part of the privileges, immunities, rights, and liberties of citizens.").

79.     As for La. Rev. Stat. § 14:100.1, Ms. Fogleman-Laxey's BBQ protest did not obstruct any public sidewalk, street, highway, bridge, alley, road, or other passageway.  Neither did her BBQ protest obstruct the free, convenient, and normal use of any entrance, corridor, or passage of any public building, structure, watercraft or ferry.

80.     As for La. Rev. Stat. § 14:103(A)(5), the application of this statute, which was only used against Ms. Fogleman-Laxey after she was arrested for obstructing a public roadway, to

Ms. Fogleman-Laxey's peaceful BBQ protest on a public street infringed on her First Amendment rights to exercise free speech and peaceful assembly and to petition the government

81.     The application of these statutes to Ms. Fogleman-Laxey's peaceful BBQ protest on a public street infringed on her First Amendment rights to free speech, peaceful assembly, and petition of government because:

      a.  She engaged in a peaceful assembly in the presence of friends, family, local residents, online protestors, and the media.

      b.  Her BBQ equipment, vehicle, other belongings, and person did not block or restrict any public movement.

      c.  Vehicles were able to freely move in a convenient and normal way on the public road, unimpeded by the presence of her BBQ equipment, vehicle, other belongings, and person.

      d.  Persons were able to move freely and in a convenient and normal way on the public sidewalk, street, and road, unimpeded by the presence her BBQ equipment, vehicle, other belongings, and person.

      e.  No action taken by Ms. Fogleman-Laxey in placing and/or using her BBQ equipment, which was located on the public road behind her truck, impeded, hindered, stifled, delayed, or restrained traffic or passage on the public sidewalk, street, or road.

82.     Ms. Fogleman-Laxey's BBQ protest on a public street, including making it available to thousands online via the Video, was a constitutionally protected exercise of her rights to free speech, peaceful assembly, and petitioning of the government.  Defendants' unlawful arrest of Ms. Fogleman-Laxey deliberately violated the well-established exercise of such rights in public

forums such as public streets, roads, and spaces.

83.     Defendants' actions were not a reasonable regulation of the time, place, or manner of Ms. Fogleman-Laxey's First Amendment protected activity.  Defendants' actions were not based on a compelling—or even rational—governmental interest justifying the infringement of Ms. Fogleman-Laxey's First Amendment rights.

**COUNT 2:**
**VIOLATIONS OF ARTICLE I, SECTIONS SEVEN AND NINE OF THE LOUISIANA CONSTITUTION (AGAINST ALL DEFENDANTS)**

84.     Ms. Fogleman-Laxey repeats and re-alleges the preceding allegations and incorporates them here by reference as if fully set forth herein.

85.     Article I, Section Seven of the Louisiana Constitution prohibits the curtailment or restriction of the freedoms of speech and press and guarantees every person the right to "speak, write, and publish his sentiments on every subject."  La. Const. art. I, § 7.

86.     Article I, Section Nine of the Louisiana Constitution protects "the right of any person to assemble peaceably or to petition government for a redress of grievances."  La. Const. art. I, § 9.

87.     Defendants' actions in punishing the peaceful demonstration of Ms. Fogleman-Laxey, as described above, interfered with the exercise of her fundamental rights, including the right to expression, to assemble, and petition the government as guaranteed by Article I, Sections 7 and 9 of Louisiana's Constitution.

**COUNT 3:**
**RETALIATORY ARREST IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS AND 42. U.S.C. § 1983 (AGAINST ALL DEFENDANTS)**

88.     Ms. Fogleman-Laxey repeats and re-alleges the preceding allegations and incorporates them here by reference as if fully set forth herein.

89.     On August 29, 2020, Ms. Fogleman-Laxey was engaged in protected First Amendment activity—namely, exercising her right to free speech and assembly near Mayor Guillory's house while barbecuing some hamburgers and hotdogs.

90.     As a result of this activity, and in retaliation for said activity, Defendants ordered or directed Defendant Officers to arrest Ms. Fogleman-Laxey.  Defendant Officers arrested Ms. Fogleman-Laxey as ordered, directed, or of their own fruition.

91.     Ms. Fogleman-Laxey was charged with obstructing a passageway and later charged with disturbing the peace, despite no probable cause for such charges. Defendants knew or should have known that no probable cause or sufficient evidence existed to arrest and/or prosecute Ms. Fogleman-Laxey.

92.     This arrest, detention, and prosecution was sufficiently adverse as to chill a person of ordinary firmness from engaging in such protected activity because Ms. Fogleman-Laxey was subjected to a humiliating strip search, had to appear court, and retain the assistance of counsel, before the charges were finally dropped.

93.     The individual Defendants' adverse actions in arresting, detaining, and prosecuting Ms. Fogleman-Laxey—at Mayor Guillory's direction, or with his encouragement—were done for the improper purpose of deterring or discouraging Ms. Fogleman-Laxey and other activists or would-be activists from engaging in First Amendment activities.

94.     Upon information and belief, the Defendants conspired to and acted together under color of state law and violated Ms. Fogleman-Laxey's constitutional rights as alleged above.

95.     As a direct and proximate result of the Defendants' misconduct, Ms. Fogleman-Laxey suffered injuries as more fully alleged above, including but not limited to the loss of liberty and the immediate silencing of her protest and Video.  Furthermore, she fears future retaliation

should she observe or participate in protest activity.

96.    In fact, Defendants' unlawful actions have caused Ms. Fogleman-Laxey to engage in less First Amendment protected activity, such as protesting racial injustice and police brutality, because she fears Defendants will once again unlawfully arrest, search, including strip-searching her, and detain her in a facility without proper COVID-19 protections.

97.    Defendants' actions described herein were substantially motivated against the exercise of Ms. Fogleman-Laxey's clearly established constitutional rights.

**COUNT 4**
**UNLAWFUL SEARCH AND SEIZURE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983 (AGAINST ALL DEFENDANTS)**

98.    Ms. Fogleman-Laxey repeats and re-alleges the preceding allegations and incorporates them here by reference as if fully set forth herein.

99.    The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," as applied to the states under the Fourteenth Amendment to the United States Constitution. At all relevant times, Defendants were state actors acting under the color of law and pursuant to their policies, customs, and practices.

100.    The right not to be arrested or detained, which constitutes a seizure, without probable cause was clearly established at the time of Ms. Fogleman-Laxey's arrest and detention.

101.    The right not to be arrested or detained, which constitutes a seizure, for exercising one's First Amendment protected rights to speak freely, peacefully assemble, and petition the government were clearly established at the time of Ms. Fogleman-Laxey's arrest.

102.    Defendant Officers knew or should have known that Ms. Fogleman-Laxey's arrest was without probable cause and in violation of her First Amendment rights.

103.    Any reasonable police officer in Defendant Officers' shoes would have known from the facts at the scene of the BBQ protest that Ms. Fogleman-Laxey's BBQ grill was *not* obstructing a passageway, the law she was claimed to have violated, and would know that arresting or detaining her for said violation was without probable cause and a violation of her clearly established constitutional rights.

104.    Any reasonable police officer in Defendant Officers' shoes would have known that arresting and detaining Ms. Fogleman-Laxey for exercising her First Amendment rights at the BBQ protest was objectively unreasonable and was a violation of her clearly established constitutional rights.

105.    A pat-down search by law enforcement violates an individual's Fourth Amendment rights when the frisk is "not supported by a reasonable belief that [the individual] was armed and presently dangerous." *Ybarra v. Illinois*, 444 U.S. 85, 92-93 (1979).

106.    Defendants violated Ms. Fogleman-Laxey's Fourth Amendment right to be free of unreasonable and unlawful searches by conducting a warrantless pat-down search without reasonable suspicion, her consent, exigent circumstances, and/or reasonable grounds to believe that Ms. Fogleman-Laxey was armed and dangerous.

107.    The same is true for the invasive strip search in the Correction Center. Alternatively, to the extent that such strip search is a practice or policy applicable to everyone booked in to the Correction Center, the invasive strip search was a foreseeable harm that resulted from Defendants' arrest of Ms. Fogleman-Laxey without probable cause.

108.    Defendants violated Ms. Fogleman-Laxey's Fourth Amendment right to be free from unreasonable and unlawful seizures by detaining—*i.e.*, seizing—Ms. Fogleman-Laxey and seizing her cell phone without probable cause.

109.    Defendants also violated Ms. Fogleman-Laxey's rights by searching and seizing her as retaliation for her exercise of her First Amendment rights.

110.    As a direct and proximate result of Defendants' unlawful arrest, search, and seizure of Ms. Fogleman-Laxey she has suffered physical harm, economic harm, emotional harm, including anxiety, panic attacks, depression, and fear of future harm, which has led to the chilling of her First Amendment rights.

111.    Ms. Fogleman-Laxey is entitled to punitive damages against Defendants under 42 U.S.C. § 1983 because their actions were malicious, willful, or, at a minimum, committed with reckless or wanton disregard for Ms. Fogleman-Laxey's constitutional rights.

112.    Ms. Fogleman-Laxey is also entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest, and costs allowable by federal law.

**COUNT 5**
***MONELL* CLAIM FOR VIOLATIONS OF FIRST, FOURTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983 (AGAINST DEFENDANTS THE LAFAYETTE CONSOLIDATED GOVERNMENT, MAYOR GUILLORY, DA LANDRY, CHIEF MORGAN, AND SHERIFF GARBER)**

113.    Ms. Fogleman-Laxey repeats and re-alleges the preceding allegations and incorporates them here by reference as if fully set forth herein.

114.    Under *Monell v. Dep't. of Social Services,* 436 U.S. 658, 694 (1976), "[t]o establish municipal liability under §1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Piotrowski v. City of Hous.,* 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694). There are five types of official "policies" that meet *Monell's* first element: (1) formal policies; (2) de facto policies and customs; (3) failure to train and/or failure to supervise; (4) single decision by a final policymaker; and (5) ratification of a subordinate's unconstitutional act.

115.    The decisions to arrest and prosecute Ms. Fogleman-Laxey for engaging in constitutionally protected acts were made by decision makers with final authority to establish Consolidated Government policy with regards to the arrest and prosecution of Ms. Fogleman-Laxey.  Mayor Guillory, as the final decision maker for the Consolidated Government on law enforcement and prosecution of criminal charges, ordered and/or directed Chief Morgan and the Police to arrest Ms. Fogleman-Laxey, Sheriff Garber and the Sheriff's Department to detain her, and DA Landry to prosecute her.  Mayor Guillory issued these orders and/or directives without a just cause, reason, or legal basis for the action because Ms. Fogleman-Laxey exercised her constitutionally protected rights near his house during the BBQ protest and/or at the Patriots meeting.

116.    Alternatively: (1) Chief Morgan, the final decision maker on law enforcement in the City of Lafayette, ordered his Defendant Officers to arrest Ms. Fogleman-Laxey where they had no probable cause or other justifiable reason to do so because Ms. Fogleman-Laxey exercised her constitutionally protected rights near Mayor Guillory's house during the BBQ protest; (2) Sheriff Garber, the final decision maker on law enforcement in the Parish of Lafayette, ordered his Defendant Officers to detain Ms. Fogleman-Laxey in violation of Correctional Center's COVID Intake Policy and in flagrant disregard for Ms. Fogleman-Laxey's heightened risk of complications from COVID-19 due to her pre-existing conditions because Ms. Fogleman-Laxey exercised her constitutionally protected rights near Mayor Guillory's house during the BBQ protest; and (3) DA Landry, the final decision maker on prosecutorial discretion, filed formal charges against Ms. Fogleman-Laxey because Ms. Fogleman-Laxey exercised her constitutionally protected rights near Mayor Guillory's house during the BBQ protest and/or during the Acadiana Patriots meeting. All said actions were taken without a just cause, reason, or legal basis for the action.

117.     The Consolidated Government had de facto policies, customs, practices to use state law, including Title 14, §§ 14:100.1 and 14:103 of the La. Rev. Stat., to arrest peaceful protestors exercising their constitutionally protected First Amendment rights to speak out against racial injustice and/or police brutality. The Police and Sheriff's Office, two entities within the Consolidated Government, had a de facto policy and/or custom, as explained by Chief Morgan, to charge protestors with disturbing the peace and/or obstructing a public passageway when protestors engaged in constitutionally protected First Amendment activities they did not like, including Ms. Fogleman-Laxey's BBQ protest. Upon information and belief, these de facto policies, customs, practices were instituted and/or ratified by Mayor Guillory, Chief Morgan, Sheriff Garber, and/or DA Laundry.

118.     The Consolidated Government also had de facto policies, customs, and or practices to engage in the excessive use of force and/or retaliatory arrests against peaceful protestors demonstrating against racial injustice and/or police brutality.  Upon information and belief, these de facto policies, customs, practices were instituted and/or ratified by Mayor Guillory, Chief Morgan, Sheriff Garber, and/or DA Laundry. Defendant Officers' unconstitutional arrest of Ms. Fogleman-Laxey reflects the Consolidated Government's deliberate indifference to the unconstitutional customs and practices of the Police, Sheriff's Office, and District Attorney's Office, including but not limited to: (1) falsely arresting individuals for speech allegedly in violation of the general disturbing the peace or obstruction of the passageway statutes without probable cause, in violation of the First and Fourth Amendment; (2) enforcing said statutes and other similar statutes in a manner that infringes on the rights of free speech, expression, and assembly and as an improper means for retaliating against protected expression and activity, in violation of the First Amendment; and (3) pursuing baseless municipal prosecutions for alleged

violations of said statutes and other similar statutes, without probable cause, with malice, and for improper retaliatory purposes.   Despite having notice of these continuing, widespread, and persistent de facto policies, customs, and patterns of biased policing and prosecution, the Consolidated Government has failed to take appropriate action to discipline and correct said behavior by the Police, Sheriff's Office, and District Attorney's Office—resulting in the constitutional harm to Ms. Fogleman-Laxey and the risk of future harm to other similarly situated persons.

119.   In addition, by refusing to discipline Defendant Officers in response to their conduct during Ms. Fogleman-Laxey's arrest, the Consolidated Government, Chief Morgan, and Sheriff Garber ratified Defendant Officers' conduct, such that it continued the de facto official policies, customs, and practices previously described.

120.   Defendants' actions described above were official polices promulgated by the Consolidated Government's policymakers that were the moving force behind the violation of Ms. Fogleman-Laxey's constitutional rights under the First, Fourth, and Fourteenth Amendments. Said violations caused Ms. Fogleman-Laxey harm, injury, and loss of liberty and have chilled her future exercise of constitutionally protected rights for fear that she will be harmed, injured, and deprived of liberty by the Defendants. Defendants are liable to her under 42 U.S.C. § 1983.

## COUNT 6
## MALICIOUS PROSECUTION
## (AGAINST DEFENDANTS MAYOR GUILLORY AND DA LANDRY)

121.   Ms. Fogleman-Laxey repeats and re-alleges the preceding allegations and incorporates them here by reference as if fully set forth herein.

122.   Under Louisiana law, the elements of malicious prosecution are: "(1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal

causation by the present defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage conforming to legal standards resulting to plaintiff." *Lemoine v. Wolve*, 168 So.3d 362, 367 (La. 2015).

123.   Defendants' actions constitute malicious prosecution because:

    a.   Criminal proceedings for obstructing a public passageway and disturbing the peace were instituted against Ms. Fogleman-Laxey in the 15th Judicial District Court of Lafayette, Louisiana.

    b.   The criminal proceedings were instituted by or at the insistence of the Mayor and DA Landry.

    c.   The criminal proceedings were terminated in Ms. Fogleman-Laxey's favor, with all charges dropped on February 9, 2021.

    d.   Under Louisiana law, lack of probable cause and malice are presumed and the burden is shifted to Defendants where charges are dismissed prior to trial. *Zerbe v. Town of Carencro*, 884 So.2d 1224, 1231 (La. App. 3 Cir. Oct. 6, 2004).

    e.   Defendants lacked probable cause for the commencement of proceedings for obstructing a public passageway and disturbing the peace.

    f.   Defendants did not have reasonable grounds to believe that Ms. Fogleman-Laxey was obstructing a public passageway, as described in L.A. Rev. Stat. § 14:100.1, because several vehicles and persons, including the police officers, traversed the public sidewalk, street, and road where she set up her BBQ equipment during her protest unimpeded and with ease.

g.  Defendants lacked probable cause because it is unreasonable for Defendants to have held an honest belief that Ms. Fogleman-Laxey's BBQ pit, which was placed directly behind her truck and narrower in width than the truck, was obstructing the public road.

h.  As a direct and proximate result of Defendants' conduct, Ms. Fogleman-Laxey has suffered damages including, without limitation, physical pain, mental anguish, and continual loss of reputation in the community.  She is entitled to special damages amounting to legal fees in this proceeding and in her criminal proceedings.

124.    Further, Defendants' malicious prosecution of Ms. Fogleman-Laxey occurred in tandem with the violations of her rights protected by the United States and Louisiana Constitutions.

125.    Defendants are liable for malicious prosecution as a matter of federal law, actionable under 42 U.S.C. § 1983, for violation of Ms. Fogleman-Laxey's Fourth Amendment rights to be free of unreasonable search and seizure. *Whittington v. Maxwell*, 455 F. App'x 450, 457 (5th Cir. 2011).

126.    Alternatively, Defendants are liable for malicious prosecution as a matter of Louisiana common law.  *Lemoine v. Wolve*, 168 So.3d 362, 367 (La. 2015).

### <u>COUNT 7</u>
### FALSE ARREST / FALSE IMPRISONMENT UNDER LOUISIANA LAW
### (AGAINST DEFENDANT OFFICERS)

127.    Ms. Fogleman-Laxey repeats and re-alleges the preceding allegations and incorporates them here by reference as if fully set forth herein.

128.    Under Louisiana law, the elements of a tort claim for false arrest or imprisonment are "(1) the detention of a person; and (2) the unlawfulness of the detention." *Parker v. Town of*

*Woodworth*, 86 So. 3d 141, 144 (La. App. 3 Cir. Mar. 7, 2012).  Under Louisiana law, "[f]alse arrest and imprisonment occur when one arrests and restrains another against his will without a warrant or other statutory authority[.] That statutory authority is La.C.Cr.P. art. 213, and it requires that the peace officer have 'reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer.' La.C.Cr.P. art. 213(3). Reasonable cause to arrest without a warrant is the equivalent of probable cause to obtain an arrest warrant." *Dyas v. Shreveport Police Dep't*, 136 So.3d 897, 903 (La. App. 2 Cir. Feb. 26, 2014).

129.    A Defendant Officer placed Ms. Fogleman-Laxey in a police car and took her to the police station. At the station, said officer handcuffed Ms. Fogleman-Laxey to a wall. She was then driven to the Lafayette Correctional Center, a jail operated by the Sherriff, where she was held until her release hours later.

130.    Ms. Fogleman-Laxey's arrest was instituted without probable cause because she was not obstructing any passing traffic on the street, her truck was not obstructing any traffic on the street, and the BBQ grill that was placed directly behind her parked truck was also not blocking nor obstructing any traffic on the street. Moreover, at no point was there probable cause to believe that Ms. Fogleman-Laxey was disturbing the peace.

131.    As a direct and proximate result of Defendants' conduct, Ms. Fogleman-Laxey has suffered damages including, without limitation, physical pain, mental anguish, and continual loss of reputation in the community.

## COUNT 8
## ABUSE OF PROCESS UNDER LOUISIANA LAW
## (AGAINST DEFENDANTS MAYOR GUILLORY, OFFICER DOES, AND DA LANDRY)

132.    Ms. Fogleman-Laxey repeats and re-alleges the preceding allegations and incorporates them here by reference as if fully set forth herein.

133.   Under Louisiana law, the elements of an abuse of power claim are: "(1) the existence of an ulterior purpose; and (2) a willful act in the use of the process not proper in the regular prosecution of the proceeding." *Phillips v. Whittington*, No. 17-1524, 2020 U.S. Dist. LEXIS 200918, at 110-11 (W.D. La. Oct. 28, 2020); *see also Taylor v. State*, 617 So. 2d 1198, 1206 (La. App. Ct. 1993) (stating that "defendant did not follow proper rules of procedure as he initiated an investigation without reasonable suspicion").

134.   Defendants' actions constitute abuse of process because:

    a.   At the request of the Mayor, Defendants removed Ms. Fogleman-Laxey from a public roadway without a legal basis for doing so.

    b.   Defendants removed Ms. Fogleman-Laxey from a public roadway to save the Mayor the embarrassment, personally and politically, of having a protest in the public road in front of his home.

    c.   Defendants removed Ms. Fogleman-Laxey from a public roadway for ulterior purposes without a legal basis for arresting her.

    d.   Defendants did not follow the proper process "in the regular prosecution of the proceeding" when Defendants:

        i.   Initiated the arrest without a demonstrated reasonable suspicion;

        ii.   Removed Mr. Harvin, a Consolidated Government employee and potential participant, from the scene in advance of the arrest;

        iii.   Did not allow Ms. Fogleman-Laxey to relocate the BBQ grill;

        iv.   Seized property, specifically a mobile cell phone, that was recording the BBQ protest and the Defendant Officers' actions when the phone was not on Ms. Fogleman-Laxey's person at the time of arrest;

v.  Held Ms. Fogleman-Laxey in the Correctional Center in violation of the COVID Intake Policy and other policies and orders for a period of time without her consent and without probable cause during a global pandemic;

vi. Denied Ms. Fogleman-Laxey the ability to wear clean or otherwise sufficient personal protective equipment while being held without her consent in the Correctional Center—thus exposing her to a deadly disease.

### COUNT 8
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER LOUISIANA LAW (AGAINST DEFENDANTS MAYOR GUILLORY AND DA LANDRY)

135.    Ms. Fogleman-Laxey repeats and re-alleges the preceding allegations and incorporates them here by reference as if fully set forth herein.

136.    A cause of action for intentional infliction of emotional distress is viable in Louisiana when the plaintiff can demonstrate: (1) the defendant's conduct was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and, (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *Harvey v. Dietzen*, 716 So. 2d 911, 916 (La. App. 4 Cir. 1998);

137.    The Defendant Mayor Guillory and DA Landry violated Louisiana law by committing intentional torts while acting within their authority as public officials.

138.    At all relevant times, the Defendants were acting under the color of state law.

139.    Defendants desired to inflict severe emotional distress on Ms. Fogleman-Laxey or knew that severe emotional distress would be certain or substantially certain to result from their acts or omissions.

140.    Defendant Mayor Guillory's conduct to order an unlawful arrest of a peaceful

civilian was extreme and outrageous.

141.    Defendant DA Landry's conduct to use his prosecutorial discretion to charge Ms. Fogleman-Laxey with baseless charges was extreme and outrageous.

142.    As a direct and proximate result of Defendants misconduct, Ms. Fogleman-Laxey has experienced physical harm, reputational harm, economic harm, and emotional harm, including depression, anxiety, and sleeplessness.

### COUNT 9
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS UNDER LOUISIANA LAW (AGAINST DEFENDANTS OFFICER DOES)

143.    Ms. Fogleman-Laxey repeats and re-alleges the preceding allegations and incorporates them here by reference as if fully set forth herein.

144.    A negligent infliction of emotional distress claim is viable when the plaintiff can demonstrate: (1) the defendant had a duty to conform his conduct to a specific standard of care; (2) the defendant failed to conform his conduct to the appropriate standard; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and, (5) actual damages. *Covington v. Howard*, 146 So. 3d 933, 937 (La.App. 2 Cir. 2014).

145.    Each Defendant Officer owed a duty of care to Ms. Fogleman-Laxey to act reasonably under the circumstances.

146.    Each Defendant Officer also owed a duty of care to Ms. Fogleman-Laxey to intercede to prevent the use of unreasonable and excessive force by the other Defendant Officers on Ms. Fogleman-Laxey, and each of the Defendant Officers was in a position to intercede to prevent the use of such unreasonable force.

147.    By refusing to accommodate Ms. Fogleman-Laxey's pre-existing back injury, and

by forcibly keeping Ms. Fogleman-Laxey in a prison cell against the COVID-19 Intake Policy, and refusing to provide Ms. Fogleman-Laxey adequate personal protection equipment, each Defendant Officer breached their duty of care to Ms. Fogleman-Laxey by failing to act reasonably under the circumstances.  Defendant Officers used unreasonable and excessive force against Ms. Fogleman-Laxey, an individual whom the Defendant Officers knew had a pre-existing back injury. The Defendant Officers' use of force was also unreasonable and excessive in view of, among other factors, the non-violent nature of the alleged offense, the minimal chance of and lack of any attempt by Ms. Fogleman-Laxey to escape by flight, and the lack of any actual or potential weaponry near Ms. Fogleman-Laxey.

148.    Each Defendant Officer was in a position to intercede to prevent the use of unreasonable and excessive force by the other Defendant Officers on Ms. Fogleman-Laxey. By failing to intercede when the other Defendant Officers used such unreasonable and excessive force, each Defendant Officer breached their duty of care to Ms. Fogleman-Laxey.

149.    The Defendant Officers' use of unreasonable and excessive force on Ms. Fogleman-Laxey had a strong likelihood of causing, and was a direct and proximate cause of, Ms. Fogleman-Laxey's genuine and serious emotional injury and psychiatric distress. Ms. Fogleman-Laxey continues to suffer from severe anxiety, depression, humiliation, anguish, and loss of enjoyment of life as she is essentially home bound out of fear of retribution and retaliation.

## PRAYER FOR RELIEF

Wherefore, in light of the foregoing, Ms. Fogleman-Laxey respectfully requests that this Court enter judgment against each Defendant, jointly and severally, and award the following relief in an amount to be determined at trial for the violations of Ms. Fogleman-Laxey's constitutional, statutory, and common-law rights:

a.  Compensatory and punitive damages to be developed during discovery and proven at trial;

b.  A declaration that La. Rev. Stat. §§ 14:103 and 14:100.1, facially and/or as applied, violate the rights to free speech, peacefully assemble, and petition the government under the U.S. and Louisiana constitutions.

c.  A permanent injunction or other order preventing Defendants from using La. Rev. Stat. §§ 14:103 and 14:100 to violate the rights to free speech, peacefully assemble, and petition under the U.S. and Louisiana constitutions.

d.  Reasonable attorneys' fees and costs as provided under 42 U.S.C. § 1988; and

e.  Such other relief as this Court may deem just and proper.

Date: August 27, 2021

Respectfully submitted,

/s/ *Megan E. Snider*
Megan E. Snider
LA. Bar No. 33382
Nora Ahmed*
New York Bar No. 5092374
ACLU FOUNDATION OF LOUISIANA
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: 504 522 0628
msnider@laaclu.org
nahmed@laaclu.org

KELLEY DRYE & WARREN LLP

/s/ *Fabio Dworschak*
Fabio Dworschak (T.A.)*
Texas Bar No. 24098694
Nancy Yanochik*
Texas Bar No. 01293000
515 Post Oak Boulevard, Suite 900
Houston, TX 77027
Tel: (713) 355-5000
Fax: (713) 355-5001
fdworschak@kelleydrye.com
nyanochik@kelleydrye.com

/s/ *James O'Gara*
James "Jim" O'Gara*
New York Bar No. 1638808
Malavika "Molly" Rao*
New York Bar No. 5366018
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-7800
Fax: (212) 808-7897
jogara@kelleydrye.com
mrao@kelleydrye.com

/s/ *Kaelyne Yumul Wietelman*
Kaelyne Yumul Wietelman*
Virginia Bar No. 95060
Washington Harbour
3050 K Street NW, Suite 400
Washington, DC 20007
Tel: (202) 342-8478
Fax: (202) 342-8451
kwietelman@kelleydrye.com

*Pro hac vice forthcoming*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of August, 2021, I electronically filed a copy of the above and foregoing pleading with the Clerk of Court through use of the CM/ECF system which will send a notice of electronic filing to those who are on the list to receive e-mail notices for this case. I further certify that I served the foregoing document and notice of electronic filing by United States Mail or e-mail to any non-CM/ECF participants.


*/s/ Megan E. Snider*
Megan E. Snider